Barbara LeBRUN, Plaintiff,

v.

Richard THORNBURGH, Esq., et al., Defendants.

Civ. No. 89–2790 (HLS).

United States District Court, D. New Jersey.

Nov. 19, 1991.

Michael Chertoff, U.S. Atty., Newark, N.J., for Richard Thornburgh.

Dennis J. Cummins, Jr., Fair Lawn, N.J., for Barbara LeBrun.

## AMENDED OPINION

SAROKIN, District Judge.

*Introduction*

Plaintiff, born in France, the daughter of an American World War II soldier, has been denied United States citizenship. Plaintiff's parents were unmarried, and her father returned to the United States after the war. Plaintiff's mother, a French citizen, remained in France with her daughter.

In order for plaintiff to have been eligible for citizenship, it was necessary that she be recognized and acknowledged by her father before she became 21. Plaintiff was not "legitimated" by her father until 1981, the year that he died, at which time she was then 35 years old. In addition to the legitimacy requirement, under the then-applicable law, plaintiff could not become a citizen unless she had already resided in the United States for five years between the ages of 13 and 21 or five years between

the ages of 14 and 28. Not unsurprisingly, plaintiff did not meet these requirements, because her father had not acknowledged his parenthood. The requirements no longer exist, but nonetheless they have been applied to deny plaintiff's application for citizenship. Thus, in effect, plaintiff's father, by his delay in acknowledging his parenthood of plaintiff, has denied her the opportunity for citizenship in this country, and the Immigration and Naturalization Service ("INS") has condoned his conduct by denying plaintiff's application.

The court concludes that the applicable law discriminates against "illegitimate" children, and thereby violates the Equal Protection Clause of the United States Constitution. The law as it then existed and as applied in this matter served to make the citizenship of children born out of wedlock to American fathers, particularly those serving in the armed forces, subject to the personal vagaries and consciences of their fathers. Those who chose to act with honor could confer such citizenship, and those who chose not to, could deny citizenship to their offspring. Even the dilatory father, as in this case, could defeat his child's claim to citizenship merely by delaying the recognition of his responsibility, until it was too late to satisfy the residency requirements.

Those who have no choice in the marital state of their parents should not be so penalized or stigmatized, and their rights to citizenship should not be dependent on the moral fortitude (or lack thereof) of one of their parents. The unfairness is exacerbated by placing such power solely in the hands of the male parent. The law was thus discriminatory in its impact upon children born out of wedlock and sexist in making citizenship dependent upon the acquiescence of the male parent only.

*Background*

Before the court is defendants' motion for summary judgment.

Plaintiff was born on August 3, 1945, in Paris, France. Her natural parents, who were not legally married at the time, were Renee Foucher, a citizen and national of France, and Frank Pasek, Jr., a citizen and national of the United States. Amended Complaint, ¶¶ 5–7; admitted in Answer. According to the Department of State Passport Agency, records indicate that plaintiff's father acknowledged paternity in correspondence to plaintiff's mother dated November 15, 1945. *See* Amended Complaint, Exh. D1.[1] It was not until April 10, 1981, that plaintiff's natural father filed an acknowledgment of his paternity of plaintiff in France, thereby "legitimating" plaintiff in accordance with the laws of his domicile, New Jersey. Amended Complaint, ¶ 9. Four months later, Frank Pasek, Jr., died on August 20, 1981.

In November, 1985, plaintiff filed for a Certificate of Citizenship. Plaintiff's application was denied by the INS, District of New York, on November 20, 1986. Amended Complaint, Exh. B. On December 3, 1986, plaintiff appealed the denial to the Regional Commissioner; on July 29, 1987, Thomas W. Simmons, Chief of the INS Administrative Appeals Unit ("AAU"), denied the appeal. *Id.*, Exh. C. Plaintiff had also applied for a passport, in 1986. That application was denied by the Regional Director for the U.S. Passport Agency on March 31, 1987. *Id.*, Exh. D.[2]

An exclusion proceeding which was begun earlier was adjourned several times pending plaintiff's application for a Certificate of Citizenship. Administrative Law Judge ("ALJ") Elstein, on March 7, 1989, terminated the exclusion proceedings against plaintiff, and ordered that she be admitted to the United States as a temporary visitor for business or pleasure, until June 30, 1989. *See* Def. Reply Brief, Exh. A, at 5. On March 21, 1989, plaintiff appealed to the Board of Immigration Appeals ("BIA"). The BIA denied plaintiff's application on July 18, 1990.

---

1. This correspondence cannot under the law substitute for the filing of a formal acknowledgment of paternity to "legitimate" plaintiff.

2. To challenge that denial plaintiff filed a complaint with this court, which was dismissed for lack of jurisdiction.

On August 13, 1990, plaintiff filed the instant action. In the First Count of the Amended Complaint, plaintiff asks that she be admitted to citizenship, that Section 301 of the Immigration and Nationality Act of 1952 (the "Act"), 8 U.S.C. § 1401, not be applied to her, and/or that § 301 be declared unconstitutional. *Id.* at Exh. E. That section requires a citizen born abroad to reside in the United States for a certain period of time in order to retain citizenship rights. Plaintiff challenges these retention requirements as violative of her Equal Protection and Due Process rights.

Plaintiff raises an additional challenge to the denial of her citizenship rights in the Second Count of the Amended Complaint. Plaintiff alleges that when she was 19 years old she

> went to the U.S. Embassy in Paris, France, to find out what she had to do to come to the United States.
>
> She was told by an agent employee at the U.S. Embassy that she had nothing to worry about; that the United States takes care of its "war babies." She was told that she was a citizen and that she would have no problem going to the United States when she was ready.
>
> Relying on this information the plaintiff never sought to enter the United States within the then retention period. Had she been told accurately, it is urged here that she would today be a full fledged United States Citizen.

Amended Complaint, Second Count, ¶¶ 2–4.

Defendants now move for summary judgment, asking this court to dismiss the complaint.

*Statutory Framework*

In plaintiff's applications for a Certificate of Citizenship and a passport, her claim has been interpreted under the following provisions of the relevant statutes.

The residency requirements for the retention of citizenship for a foreign born citizen that was initially applicable to plaintiff was contained in the Nationality Act of 1940. Section 201(i), codified at 8 U.S.C. § 601, was enacted July 31, 1946.

Sec. 201. The following shall be nationals and citizens at birth:

. . . . .

(i) A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who has served or shall serve honorably in the armed forces after December 7, 1941, and before the date of termination of hostilities in the present war as proclaimed by the President or determined by the joint resolution by the Congress and who, prior to the birth of such person, has had ten years residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of twelve years, the other being an alien: *Provided,* that in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years: *Provided further,* that, if the child has not taken up residence in the United States or its outlying possessions by the time he reaches the age of sixteen years, or if he resides abroad for such a time that it becomes impossible for him to complete the five years' residence in the United States or its outlying possessions before reaching the age of twenty-one years his American citizenship shall thereupon cease.

■ Section 201(g) of the Nationality Act does not apply to plaintiff, as by its own terms it "shall not apply to a child born abroad whose American parent is at the time of the child's birth residing abroad solely or principally in the employment of the Government of the United States," as plaintiff's father was. Furthermore, the requirement in Section 205 of legitimation by age 21 is not applicable to Section 201(i). *See Y.T. v. Bell,* 478 F.Supp. 828, 831 (W.D.Pa.1979).

The Nationality Act was repealed by the Immigration and Nationality Act of 1952, and section 301(b), codified at 8 U.S.C. § 1401(b), changed the applicable retention requirement to five years of residence in the United States or its territories between

the ages of 14 and 28. In 1972, the law was again modified to require two years physical presence in the United States or its territories between the ages of 14 and 28. P.L. 92–584 (October 27, 1972). On October 10, 1978, Congress repealed the retention requirements entirely for any foreign born citizens who had not yet reached their 28th birthday. P.L. 95–432 (October 10, 1978).

Section 309 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1409, provided that the relevant subsections of Section 301 apply to a person born out of wedlock if the person is "legitimated" under the age of 21 years, under the law of that person's residence or domicile.

The State Department and Department of Justice, in commenting upon the proposed repeal of § 301, noted that the retention requirements "should be repealed retroactively to May 24, 1934." Letter of Patricia M. Wald, Ass't. A.G., to Peter Rodino, Chair of the House Comm. on the Judiciary (Dec. 12, 1977), Plt.Exh. D1. Unfortunately for plaintiff and others in her situation, the repeal was only enacted prospectively.

*Previous Appeals*

Plaintiff's various applications for a Certificate of Citizenship and a passport were each decided on different grounds, in some cases applying different sections of the Act. The INS applied § 309 of the Act; the Passport Agency applied § 201; and the BIA primarily discussed, and rejected, plaintiff's estoppel argument. The ALJ's ruling relied upon the earlier decisions in plaintiff's case.

The INS, in its July 29, 1987 decision by the Chief of the Administrative Appeals Unit ("AAU"), denied plaintiff's appeal on the grounds that she did not meet the requirements set forth in § 309 of the Act. Under that section, an "illegitimate" child born on or after January 13, 1941, and prior to December 24, 1952, must have been "legitimated" before age 21 under the laws of the father's domicile; the father must have had the required residence in the United States at the time of the child's birth; and the child must have complied with the residence requirements for retention of citizenship, which mandate physical presence in the United States for periods totaling five years between the ages of 13 and 21 (§ 201) or two years between the ages of 14 and 28 (§ 201 as amended by § 301). While it is unchallenged that plaintiff's father met the required residence, the INS–AAU found that plaintiff had not been properly "legitimated" under the laws of New Jersey. The AAU further found that because plaintiff first entered the United States in July 1980, when she was almost 35 years old, she could not have met the retention requirements.

The Department of State Passport Agency denied plaintiff's application for a passport based on a different section of the Act, § 201(i). That section provides that a person is a citizen at birth if born outside of the United States to a parents one of whom serves in the United States armed forces after December 7, 1941, and the other of whom is an alien. In order to retain such citizenship, under the statute, the child must reside in the United States for five years between the ages of 13 and 21 years.

The Agency found, following *Y.T. v. Bell*, 478 F.Supp. 828, that the requirement articulated in § 205, that an applicant must have been legitimated by age 21, does not apply as an additional requirement under § 201(i). However, the Passport Agency found that plaintiff had failed to meet the retention requirements of § 201(i). The Agency further noted that plaintiff failed to meet the requirements of § 201 of the Act as amended by § 301(b) of the Immigration and Nationality Act of 1952. Under the amended Act, to retain citizenship rights a person must be physically present in the United States for a period of five years between the ages of 14 and 28.

In its July 18, 1990 denial of plaintiff's application, the BIA dismissed plaintiff's estoppel argument, stating that:

while the United States Supreme Court has not resolved the issue of whether there may be any circumstances in which the government may be estopped from denying citizenship because of the con-

duct of its officials, it has made clear that consideration of this issue will not lie absent a showing of 'affirmative misconduct.'

Amended Complaint, E1 (citations omitted). The court found that plaintiff's allegations, if true, did not establish affirmative misconduct. The court noted that even if plaintiff had received misinformation from the Embassy, plaintiff did not show detrimental reliance, since she testified that she never had the funds to travel to this country between 1964 and 1974. Amended Complaint, E3, citing Tr. at 56. The decision by the Board also stated that "[n]either the immigration judge nor this Board has any jurisdiction to consider challenges to the constitutionality of the laws that we administer." Amended Complaint, E1 (citations omitted).

## Discussion

In order to prevail on a motion for summary judgment, the moving party must show that there are no genuine issues of material fact and that, viewing the facts in the light most favorable to the non-movant, the movant will prevail as a matter of law. Fed.R.Civ.P. 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 (3d Cir. 1987).

The court will address the parties' arguments in turn.

### Dismissal as to Secretary Baker

■ Plaintiff's Amended Complaint seeks a declaration of citizenship and a declaratory judgment holding the retention requirements in the Act unconstitutional. Plaintiff does not seek redress from the Secretary of State regarding the denial of her application for a passport. Accordingly, the court will grant defendants' motion to dismiss the Amended Complaint as to the Secretary of State for failure to state a claim.

Defendants further argue that plaintiff's action should be dismissed as to the Secretary of State for lack of subject matter jurisdiction. Because of its dismissal as to the Secretary for failure to state a claim, the court need not reach this argument. The court notes that defendants concede that subject matter jurisdiction exists as to defendant the Attorney General, pursuant to the Administrative Procedure Act, 5 U.S.C. § 704, which gives this court jurisdiction to hear appeals from the BIA. *See* Def. Brief at 22 n. 10, 23.

### Standing

Defendants argue that under 8 U.S.C. § 1503(a), plaintiff lacks standing to bring this suit. That section of the statute provides that a person within the United States who claims the right of citizenship and is denied, may institute an action against the head of the department or agency denying her that right, except that no such action may be instituted where the issue of the person's status as a national of the United States (1) arose by reason of, or in connection with an exclusion proceeding, or (2) is an issue in such a proceeding. Defendants argue that because plaintiff's application for citizenship in 1985 grew out of the exclusion proceedings initiated against her in 1985, she cannot maintain a suit under this action.[3]

■ The court has declined, on the instant motion, to consider plaintiff's application solely as one for citizenship; rather, the court construes the instant action as a challenge to the constitutionality of the Immigration and Nationality Act, as applied to plaintiff. Defendant concedes that plaintiff has standing to bring the constitutional challenge. *See* Reply Brief at 5 n. 5.

The Supreme Court has allowed constitutional challenges to be maintained by illegal aliens, *see, e.g., Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982); *McNary, Commissioner of Immigration and Naturalization v. Haitian*

---

**3.** Defendants further note that plaintiff's Amended Complaint is in effect a petition for a Writ of Habeas Corpus, since it amended an earlier habeas petition submitted by plaintiff, which was dismissed in November 1989 because

plaintiff's appeal to the BIA was still pending. However, because the instant complaint is not in the proper form of a petition for habeas corpus, the court will not consider it as such.

*Refugee Center, Inc.,* — U.S. ——, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); so too constitutional challenges brought by persons who may in fact be citizens, and the denial of whose citizenship rights is in question, should be permitted to go forward. The Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to *any person within its jurisdiction* the equal protection of the laws." (Emphasis added). The Supreme Court has held that

> Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.

*Plyler,* 457 U.S. at 210, 102 S.Ct. at 2391 (citations omitted). Thus plaintiff, who is not clearly an alien or a non-citizen, should be guaranteed the equal protection of the laws. *See Y.T. v. Bell,* 478 F.Supp. 828, 832 (W.D.Pa.1979) (distinguishing level of scrutiny for constitutional challenges to statutes by plaintiffs who are "clearly non-citizens" and plaintiffs who have a strong claim to citizenship).

■ Moreover, plaintiff has met the conditions for standing, as articulated in *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970), to challenge the statute under which she has been denied citizenship. She has demonstrated both injury in fact and that she is within the zone of interests to be protected or regulated by the statute.

*Estoppel*

■ Plaintiff argues that the government is estopped from denying her citizenship rights because in failing to meet the retention requirements she was relying on the misinformation given her in the United States Embassy when she was age nineteen. Plaintiff's estoppel argument must fail. While citizenship is not automatically lost where a person was misled by the action of a government official whose duty it was to inform that person, *see Matter of S—,* 8 I. & N. Dec. 226 (BIA 1958), plaintiff relies for her estoppel argument on a conversation with an unidentified employee of the American Embassy in Paris. While plaintiff was allegedly told that she was an American citizen and that she would not encounter any problems entering the United States at a later date, the record does not show that the person with whom plaintiff spoke was a government official.

Nor can plaintiff base her estoppel argument on a theory of government "affirmative misconduct." Whether "affirmative misconduct" by the government would estop it from enforcing the laws is unsettled in the caselaw. *See Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) ("We have left this issue open in the past, and do so again today."); *see also United States Immigration & Naturalization Service v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (government's failure to fully publicize rights accorded those seeking naturalization or its failure to make available authorized naturalization representatives did not constitute "affirmative misconduct"). Plaintiff's allegations as to a conversation with an unidentified individual in the United States Embassy about general citizenship rights is not sufficient to establish "affirmative misconduct" on the part of the government.

Finally, plaintiff cannot claim to fall under the exception to the strict application of the retention requirements by arguing that she was unaware of any claim for citizenship. Indeed, plaintiff's assertion that she went to the United States Embassy to inquire about her citizenship rights precludes such an argument. *See Rucker v. Saxbe,* 552 F.2d 998 (1977), *cert. denied,* 434 U.S. 919, 98 S.Ct. 392, 54 L.Ed.2d 275 (1977).

*Constitutional Claims*

Plaintiff has challenged the constitutionality of the relevant statutes under the Fourteenth Amendment.

The Supreme Court has recognized that any person within the jurisdiction of the United States, including illegal aliens, may

claim the benefit of the Fourteenth Amendment's guarantee of equal protection. *Plyler*, 457 U.S. at 215, 102 S.Ct. at 2293–94. Under well established doctrine, distinctions in the law that disadvantage "illegitimate" children must be examined by the courts with a close scrutiny. Tribe, *Constitutional Law*, 277–283 (1978).

■ In *Trimble v. Gordon*, the Court established a standard for examining statutes that distinguish between "legitimates" and "illegitimates," under which the question is whether the statute "is carefully tuned to alternative considerations." 430 U.S. 762, 772, 97 S.Ct. 1459, 1466, 52 L.Ed.2d 31 (1977) (citations omitted). The Court took into account " 'the lurking problems with respect to proof of paternity,' " but noted that while those problems " 'are not to be lightly brushed aside, ... neither can they be made into an impenetrable barrier that works to shield otherwise invidious discrimination.' " *Id.*, 430 U.S. at 771, 97 S.Ct. at 1466 (*citing Gomez v. Perez*, 409 U.S. 535, 538, 93 S.Ct. 872, 874–75, 35 L.Ed.2d 56 (1973)). While this standard of review is somewhat "narrow," *see Fiallo v. Bell*, 430 U.S. 787, 796, 97 S.Ct. 1473, 1480, 52 L.Ed.2d 50 (1977), (*citing Mathews v. Diaz*, 426 U.S. 67, 81–82, 96 S.Ct. 1883, 1892–93, 48 L.Ed.2d 478 (1976)), courts must ensure that the rights guaranteed by the Fifth Amendment have not been violated. *Plyler*, 457 U.S. at 210, 102 S.Ct. at 2391; *Fiallo*, 430 U.S. at 809–10, 97 S.Ct. at 1486–87 (Marshall, J., dissenting), and authorities cited therein. Under the standard in *Rogers v. Bellei*, 401 U.S. 815, 831, 91 S.Ct. 1060, 1069, 28 L.Ed.2d 499 (1971) (discussed *infra*), this court must ensure that the statute is not unreasonable, arbitrary or unlawful.[4]

■ The court concludes that § 309 is not "carefully tuned to alternative considerations." Even under a minimum rationality standard, the distinction made in section 309 of the statute must fail. Moreover, under the standard articulated in *Rogers v. Bellei*, the distinction is not only

unreasonable and arbitrary, but it is also, under the Equal Protection Clause, unlawful.

The statute conditions the retention of citizenship upon an official act by the father of "illegitimate" children. Courts have long recognized, however, that the rights of one cannot be made contingent upon the act of another. An individual keeps his citizenship "unless he voluntarily relinquishes it." *Afroyim v. Rusk*, 387 U.S. 253, 262, 87 S.Ct. 1660, 1665, 18 L.Ed.2d 757 (1967). Not only can plaintiff *not* be said to have voluntarily relinquished her citizenship, but she has not even been given the chance of retaining it or relinquishing it; her citizenship rights are controlled by the acts of another individual.

In *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, the Supreme Court invalidated a Texas statute which withheld from local school districts any state funds for the education of children who were not legally admitted into the United States, and which authorized local school districts to deny enrollment to such children. The Court held that the statute violated the Equal Protection Clause of the Fourteenth Amendment, stating that children, who were the plaintiffs in the case before it, " 'can affect neither their parents' conduct nor their own status.' " *Id.* at 220, 102 S.Ct. at 245, *citing Trimble v. Gordon*, 430 U.S. 762, 770, 97 S.Ct. 1459, 1465, 52 L.Ed.2d 31 (1977). The Court held that to punish children for the conduct of their parents "does not comport with fundamental conceptions of justice." *Id.* The Court went on to cite its ruling in *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1406–07, 31 L.Ed.2d 768 (1972):

"[V]isiting condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the ... child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and

---

4. The court notes the strong dissent of Justice Black in *Bellei*, in which he criticized the standard used by the majority: "not one of these tests appears in the Constitution." 401 U.S. at 837, 91 S.Ct. at 1072.

penalizing the ... child is an ineffectual—as well as unjust—way of deterring the parent."

457 U.S. at 220, 102 S.Ct. at 245. *See also Levy v. Louisiana,* 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968).

The government has offered neither a compelling state interest for maintenance of the statute, nor even a minimally rational one. Administrative costs cannot be offered by the government as justification, nor a fear of involvement with foreign laws and records. *Fiallo,* 430 U.S. at 813–814, 97 S.Ct. at 1489 (Marshall, J., dissenting). These justifications, even if they had been offered by the government, are insufficient to justify the statute.

Indeed, there can be no compelling or rational government interest for applying the statute in the instant case. Where it is undisputed that one parent of a foreign born child is a United States citizen, there is no reason to require that the citizen parent file a formal acknowledgment of the child before she reaches majority in order for the child to be considered a citizen. In the case at bar, plaintiff's father acknowledged in correspondence that he was plaintiff's father. Because he nevertheless failed to file a formal acknowledgment, thus "legitimating" her, before she reached the age of 21, under the Act plaintiff cannot be considered a citizen. If she is his daughter—and in the instant case there is no dispute that she is—why should her citizenship rights depend upon his saying so? It is wrong for a father to have the unilateral ability to confer or deny citizenship to his daughter.

█ The second requirement of the Act that plaintiff has also failed to meet is the residence retention requirement. The constitutionality of this requirement must be analyzed in light of the court's earlier discussion as to the "legitimation" requirement. As applied to an "illegitimate" child, the residence retention requirements constitute a denial of equal protection to "illegitimate" children, and therefore must likewise be invalidated.

There is no compelling, or even rational justification for the residence retention requirement. Indeed, in the Congressional debate surrounding the repeal of § 301(b) in 1978, Members of Congress indicated that the purpose of the Act, of ensuring that future citizens have a strong tie to this country and preventing a long line of foreign born citizens who have never been in the United States, is fulfilled by the residence requirements placed upon the citizen parent. As one Member of Congress noted during the debate on the repeal of § 301(b),

a U.S. citizen may not transmit citizenship to his children born abroad unless the parent has previously resided in the United States [for the requisite period of time]. H.R. 13349 does not change these transmission requirements.

Sept. 19, 1978 Congressional Record–House at 30130, Plt.Exh. B1. The Members of Congress further asserted that the residence retention requirements placed on the children creates bureaucratic havoc for the agencies, hardships on families of foreign born citizens, and is not necessary to fulfill the purposes of the Act. *See id.* ("the [Judiciary Committee does not believe that this residence requirement is necessary for the proper administration of our naturalization laws.... These provisions no longer have any significant operative effect."). Members of the House of Representatives further noted that the Departments of State and Justice had reported that the section had been difficult to administer, and that its application had resulted in hardships in some cases. *Id.* at 30131. The Members urged repeal of the Section in order to "correct an inequity which has developed in our citizenship law." *Id.* at 30130.

As applied to "illegitimate" children, the requirement is even more unjustifiable. As a factual matter, it is unlikely that a child not recognized by her citizen father would or could travel to this country in order to retain her citizenship rights. Moreover, without the emotional and perhaps financial support of a parent in this country, it is unlikely that a foreign born child would manage to arrive and thrive in the United States at the young age and for

the significant period of time required by the Act.

Furthermore, it would be very difficult for that child to enter this country in order to fulfill the retention requirements: Without a citizen-parent's formal acknowledgment and backing, how would she be able to attain a visa? While some of the cases before the courts under § 309 have involved children who arrived in this country on a student visa, a statute cannot make the retention of citizenship rights contingent upon the possibility that a foreign born citizen will obtain a student visa from the INS for a sufficient number of years, consecutively, during the requisite ages under the Act. In other words, while the Act requires a foreign born citizen to reside in this country in order to retain that citizenship, there is little chance that an "illegitimate" foreign born citizen could meet those requirements.

In *Rogers v. Bellei,* 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499, the Supreme Court emphasized that Congress' discretion in enacting laws governing the citizenship rights of persons born abroad are very broad. The Court upheld the power of Congress to confer conditional citizenship under § 309. The Court concluded that Fourteenth Amendment rights of citizenship did not extend to persons not literally naturalized *in* the United States, and thus upheld the congressional condition as "not unreasonable, arbitrary, or unlawful." *Id.* at 831, 91 S.Ct. at 1069.

However, the instant case is distinguishable. The issue presented by the instant case is a challenge to the constitutionality of the provisions regarding "illegitimates," rather than a challenge to the constitutionality of the conditionality of Congress' grant of citizenship to foreign born persons. *Y.T. v. Bell,* 478 F.Supp. 828, 832 (W.D.Pa.1979).[5] In *Bellei,* the petitioner

challenged § 309 under the Fifth, Eighth and Ninth Amendments to the United States Constitution; in the instant case, the challenge is under the Equal Protection Clause of the Fourteenth Amendment. The instant case presents a situation that is "unreasonable" and "arbitrary," as well as "unlawful," under the Equal Protection Clause, in contrast to the Court's holding in *Bellei.*

The discrimination in § 309 between persons on the basis of "legitimacy" is an archaic reminder of past discriminatory treatment of individuals in society, both in terms of the stigma of the label "illegitimate" with which it branded the children of unwed parents, and in terms of the sex discrimination that was reflected in the law that a man could "legitimate" a child, whereas a woman could not. In addition to being inhumane and unfair in this way, a distinction on the basis of "legitimacy" is also an impractical distinction in today's society, where unwed mothers abound, and single parenthood has become a norm. As such, not only is the explicit "legitimate/illegitimate" distinction in the Act unreasonable and unlawful, but also the residence retention requirement in § 301 of the Act is unlawful as applied to "illegitimates," because it promotes the efficacy of the "legitimate/illegitimate" distinction.

Accordingly, the court concludes that the distinction in the Act between "legitimate" and "illegitimate" children is an unconstitutional violation of the Equal Protection Clause. The court further holds that the residence retention requirements in the Act are an unconstitutional violation of the Equal Protection Clause as applied to "illegitimates," because those requirements ultimately sanction and perpetuate a discrimination in the law against "illegitimate" children which the court has found unconstitutional.[6]

---

5. The court in *Y.T.,* 478 F.Supp. at 832, stated that "[e]xtending the holdings of *Fiallo* and *Bellei* beyond their particular facts might impinge upon other holdings of the Supreme Court to the effect that citizenship derived by naturalization is not inferior to that derived by native birth, *Schneider v. Rusk,* 377 U.S. 163, 165, 84 S.Ct. 1187, 1188–89, 12 L.Ed.2d 218 (1964), and

that citizenship, once granted, is presumably retained unless voluntarily relinquished, *Afroyim v. Rusk,* 387 U.S. 253, 262 87 S.Ct. 1660, 18 L.Ed2d 757 (1967)."

6. The court's holding may be analogized to the "disparate impact" doctrine under Title VII, where distinctions are invalidated not only

The court concludes that, whether plaintiff's citizenship application is analyzed under § 201, § 301, or § 309, both statutes are unconstitutional as applied to "illegitimate" children. Section 309 is unconstitutional because of its requirement that a foreign born child of a United States citizen be formally "legitimated" by the age of 21, and § 201 and § 301 are unconstitutional because the retention requirements are essentially impossible for an "illegitimate" to meet. Accordingly, plaintiff's case is remanded to the INS for proceedings consistent with this opinion.

where they unlawfully disadvantage protected groups on their face, but also where distinctions have the impact of discriminating against a protected group. *See Griggs v. Duke Power,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Although the residency retention requirements are not explicitly based on a distinction violative of the Equal Protection Clause, they effectively maintain in force such a distinction, since "illegitimate" children would have no reason to come to the United States to reside in conformance with the retention requirements, nor would they have any legal right to obtain a visa to do so.